# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JOANNE FLAHERTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 2:18-cv-00240-GZS |
| | ) | |
| UNUM GROUP, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant's Motion for Summary Judgment (ECF No. 30). As explained herein, the Motion is GRANTED IN PART AND DENIED IN PART.

## I.  LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In

determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. See Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

## II.    FACTUAL BACKGROUND[1]

Defendant Unum Group ("Unum") is an insurance company specializing in disability, life, and accident insurance policies.  Plaintiff Joanne Flaherty ("Flaherty") first began working for Unum in 1976 as a medical benefits clerk.  After leaving the company in 1980, Flaherty was rehired by Unum on April 13, 1987, and worked there until her termination on March 28, 2017.  During her employment with Unum, Flaherty held a variety of different positions.  She moved into an Associate Underwriter position in 2002, and in March 2007, Flaherty was promoted to the role of Senior Underwriter, a position she held until the end of her employment with Unum.  All told, she was employed at Unum for 34 years.

During her tenure at Unum, Flaherty received regular performance evaluations.[2]  Most, if not all, of these evaluations included anonymous 360-degree feedback from co-workers.[3]  In general, these performance evaluations reflect Flaherty meeting or exceeding performance expectations.  As noted in many of the evaluations and as Flaherty herself acknowledged, her work

---

[1] The Court notes that the factual recitation that follows disregards a number of Plaintiff's additional statements of material fact that were the focus of requests to strike in Defendant's Reply Statement of Material Fact (ECF No. 38). See Pls. Add'l SMF (ECF No. 33) ¶¶ 65, 66, 67, 68, 69, 71, 72, 76 & 80.  In the Court's assessment, resolution of these requests to strike would not materially change the Court's ruling on the pending motion and the Court believes resolution of the evidentiary objections raised in these paragraphs is best reserved for trial.  All of Defendant's other requests to strike are overruled to the extent reflected in this recitation.

[2] The record includes various performance evaluations Flaherty received dating back to 1998. See ECF Nos. 25-5 - 25-16 & 32-2 – 32-9.  Focusing on Flaherty's performance evaluations prior to 2016, both sides attempt to parse these evaluations to bolster their respective views of Flaherty's record at Unum. Compare Def. SMF (ECF No. 26), PageID #s 332-333 with Pl. Response SMF (ECF No. 33), PageID #s 484-489.  While the Court has reviewed all of the performance evaluations contained in the summary judgment record, it declines to recount every cherry-picked detail cited in the parties' statements of material fact and responses thereto.  In adopting this approach to its factual recitation, the Court notes that there is no evidence suggesting that a decisionmaker viewed or relied on Flaherty's pre-2016 performance evaluations in making any decision to terminate Flaherty.

[3] To the extent that both sides draw the Court's attention to selective portions of this anonymous 360-degree feedback, these comments appear to be hearsay contained within a business record.  As a result, these anonymous comments may be admissible under F.R.E. 803(6) & 106.  However, the Court declines to consider these anonymous comments for the truth of the matter asserted in connection with the pending motion. See, e.g., Alkhatib v. Steadman, No. CIV.A. 10-00342-KD-C, 2011 WL 5553775, at *8 (S.D. Ala. Nov. 15, 2011) (refusing to consider "anonymous and edited responses to a [faculty] survey" under the business records exception).

"on feedback and communication was an ongoing, evolving process." (Flaherty Dep. (ECF No. 25-4), PageID # 130.) However, her evaluations document work and progress on communication skills as well as successful completion of performance goals, which, in turn, led to multiple promotions.

During the time period at issue, Unum maintained a Code of Conduct, which applied to all employees. (See McWilliams Ex. A (ECF No. 26-2), PageID # 357.) The Code of Conduct required all employees to "contribute to Unum's culture of ethics and compliance by understanding the Code and complying with it at all times. . . . [and] also obey all applicable laws and regulations governing our business conduct." (Id. at PageID # 357.) Unum's Code of Conduct additionally required employees to "be courteous, respectful and professional with each other and customers." (Id. at PageID # 363.) The Code also instructed employees to "be responsible in your communications" so as "to avoid misunderstandings." (Id. at PageID # 372.) Relatedly, Unum's Code of Conduct instructed employees to "[s]peak up and report issues of concern" in order to "protect[ ] yourself, your co-workers and Unum as well as allow[ ] Unum to resolve problems." (Id. at PageID # 358.) The "Speak up" policy states: "All Unum employees have an obligation to speak up. If you see behaviors, actions, or decisions, that may be a violation of the Code or any company policy, it is up to you to raise the issue promptly." (Id.)

Unum also maintained a Performance Improvement/Discipline Policy during the relevant time period. (See McWilliams Ex. B (ECF No. 26-3), PageID # 357.) While this Policy has distinct tracks for performance issues and misconduct, both tracks envision a written reprimand as a step that precedes termination in most cases.[4] Nonetheless, the misconduct portion of this Policy

---

[4] The Court acknowledges a genuine dispute as to whether the discipline meted out to Flaherty falls within the letter of this Policy as it was practiced by Unum in 2016-2017. The dispute arises from the differences in the 30(b) deposition testimony of Matthew McWilliams (ECF No. 25-33), and the actual written policy (ECF No. 26-3), along

indicates that "[s]ome inappropriate behaviors could be grounds for termination of employment without an initial or final warning." (Id. at PageID # 381.)

**2016**

In February 2016, Robert Ficker ("Ficker") became the Assistant Vice President ("AVP") of Evidence of Insurability ("EOI") Operations and Transformation.[5]  The EOI department included the medical underwriting team on which Flaherty worked.  By Ficker's own admission, Flaherty knew a lot more about medical underwriting than he did.  Underneath Ficker in the management tree was Flaherty's direct manager at the time, Tena Twomey.  Twomey had been Flaherty's direct supervisor since approximately 2002.

### Unum's Implementation of Lean Management

Part of Ficker's responsibilities as AVP of the EOI department included implementing the rollout of "lean management" (hereinafter, "Lean"), a customer-focused management system being adopted by EOI and across all of Unum's service operations teams, which included several hundred employees. Heather Levy ("Levy") and Matt Marino ("Marino") were part of a Unum team that oversaw the rollout of Lean.  Lean was initially introduced to Flaherty's medical underwriting team in Spring 2016.

The medical underwriting team, like other service operations teams at Unum that were experiencing the Lean rollout, had questions about the various changes to their jobs brought about by the implementation of Lean.  Common concerns from the medical underwriting team members included how Lean would relate to their jobs, the daily meeting requirement (referred to as "huddles"), the work tracking requirements, and worries that the new system would impair

---

with McWilliams Affidavit (ECF No. 31).  Compare ECF No. 25-33, PageID #s 323-24, with ECF No. 26-3, PageID # 378-81 & ECF No. 31, PageID # 450.

[5] At the time, Ficker was three years into his tenure at Unum, having begun in 2013 at the age of 35.

their ability to review medical files.  The team also had concerns that the required activity tracker tool was not accurately capturing their work activity.

**August 2016 Meeting**

In August 2016, Unum held a Lean related meeting with the medical underwriting team. Marino and Levy both attended but arrived late.  The purpose of this meeting was to allow the team members to ask questions and provide input about Lean in a safe, small-group environment. In advance of the meeting, the underwriters, including Flaherty, had prepared written questions and sent them to Marino.  These questions raised concerns about the tracking of the underwriters' time reviewing medical records because the volume of medical records varied for each claim.  At the August 2016 meeting, all of the medical underwriting team employees criticized and questioned certain aspects of Lean.  Many of them expressed frustration and asked tough questions about Lean and whether it was an appropriate fit for their team.

Marino and Levy did not have prepared responses to the underwriters' written questions. Marino said he did not understand their concern about tracking their time reviewing medical records because "once you know somebody is going to be declined, you don't even need to bother reading the rest of the records." (Flaherty Dep., PageID # 122.)  Marino's response raised immediate concerns with the underwriters because their underwriting practice was to capture all reasons for declining a claim.  In response to Marino, Flaherty explained, "We are required . . . to capture all the reasons why an individual might be declined. And the reason for that is if they come back and clarify something that was inaccurate in their medical records and that was the only reason we listed, we don't want to then go back and say, well, we also have this. We want to be inclusive and up front with that." (Id., PageID # 122-123.)  An underwriter then asked Marino if "he understood the different aspects of our job." (Id.)  In response, Marino replied,

"Do you think you are more important than brain surgeons? You are underwriters. Brain surgeons use this." (Id., PageID # 123.) Marino's response shut down the questions from other underwriters; Flaherty, however, followed up on the prepared questions.

Twomey, Flaherty's direct manager, thought the meeting went "great." During the meeting, Twomey agreed with the questions asked by the underwriters, often "nodding in agreement." (Ficker Aff. Ex. A (ECF No. 26-5), PageID # 390.) Ficker did not agree with Twomey's assessment of the meeting. Based on accounts of multiple co-workers, Ficker appeared angry with Flaherty by the end of the meeting, and co-workers in attendance told Flaherty that they felt her job was in jeopardy. (Flaherty Dep., PageID # 124.)

Although Flaherty left the office shortly after the meeting concluded, she recalls that Ficker met with her upon her return to work. Ficker indicated to Flaherty that he objected to what she had said during the team meeting with Levy and Marino and her tone. He indicated that Flaherty's conduct was a "disgrace to his brand." (Flaherty Dep., PageID # 121.)

Flaherty separately set up a time to meet with Levy over coffee and later apologized for the comments she had directed at Levy. (Levy Dep. (ECF No. 25-30), PageID # 311.)

**December 15, 2016 Meeting**

During a huddle meeting on December 15, 2016, which was led by Twomey, the medical underwriting team was discussing their plan for the following day, when snow was expected. Unum's policy permitted employees to work from home during inclement weather, and they were provided laptops for this purpose. At one point during the meeting, the team began discussing whether there would still be a daily morning huddle if they worked from home. Twomey, as the direct supervisor and leader of the meeting, explained that Ficker wanted the underwriters to have camera software activated on their laptops in order to have the huddle at the usual time.

Underwriter Denise Stewart ("Stewart") objected to Ficker's directive because some underwriters did not have the ability to telecom in. Stewart complained that without the ability to telecom employees would be forced to travel to work during the snowstorm. This created tension for several underwriters. One underwriter expressed concern that it appeared Ficker did not want the underwriters to work at home during the predicted snowstorm. At some point during this discussion, Ficker dropped in on the meeting.

Flaherty then asked how the team would be able to see the huddle board that normally was used as a visual aid during these morning huddles, and Twomey responded that she would likely need to move it into a conference room where the videoconference could be set up. Flaherty responded to Twomey's plan in part by describing the proposed virtual huddle as "insane." (Flaherty Dep., PageID # 141.) Flaherty made this statement "[b]ecause . . . [she] was thinking of easier ways that could be done without her physically moving a board and setting up a room," and that there must be "far more efficient ways that this c[ould] be done if the goal is to have huddles while people work at home," such as online meeting software. (Flaherty Dep., PageID #s 141-42.) Flaherty was concerned about the inefficiency of Twomey's proposal to move the huddle board because "identify[ing] inefficiencies in the workflow process" was "part of [her] job . . . ." (Id.)

According to Flaherty, Ficker became angry with her and "yelled" that he would speak to her after the meeting. (Id., PageID # 141.) According to Ficker, he perceived Flaherty's comment as unprofessional, even if the comment may not have been a violation of any Unum policy. (Ficker Dep. (ECF No. 25-25), PageID # 282.)

After the meeting, Ficker summoned Flaherty to a conference room to discuss her conduct at the huddle. (Flaherty Dep., PageID # 142; Ficker Aff. (ECF No. 26-4), PageID # 385.) Flaherty

feared that she would be fired.  In the meeting, Flaherty asked Ficker if he was aware of the company's hazardous weather policy because his comment about forcing the underwriters to be in at 7 AM sounded like he is not even aware of the hazardous weather policy.  Flaherty further explained to Ficker that "you are acting like you think we are trying to get out of work and just get a free day off, our work has to get done whether it is snowing or not snowing . . . we will come through for you and our customers because we always do."  (Flaherty Dep., PageID # 143.)

During this discussion, Flaherty acknowledged that perhaps she should not have used the word "insane," but explained that her intent was to express that Twomey physically moving the huddle board to facilitate the videoconference was not efficient.  Flaherty also challenged Ficker saying that he arrived at the huddle hostile and angry.  During this meeting with Flaherty or some other meeting in this time frame, Ficker asserted that Flaherty was resistant to change, claiming that she did not support Lean.  Ficker claimed that Flaherty had said that "the whole Lean management was insane."  Flaherty corrected Ficker, stating "that was not true at all" and "that is not what I said at all, and that is not how I feel."  (Flaherty Dep. (ECF No. 25-4), Page ID #154.)

By the end of this one-on-one meeting, Flaherty ended up crying.  Ficker asked why she was crying.  Flaherty explained, "The last thing I want to do is enter into conflict with you or to challenge you or make you look bad.  I'm trying to do my job.  And, I'm accountable for coming up with solutions, and in the past have been praised and people have thanked me for challenging the status quo; and I feel like I hit a roadblock every time I try to make a suggestion to you." (Flaherty Dep., Page ID #143.)  Ultimately, Ficker ended the meeting by giving Flaherty a hug and wishing her a nice holiday.

Later the same day, Ficker followed up this one-on-one meeting with Flaherty indicating his availability to talk further.  Flaherty responded with thanks and an apology and indicating her

hope that "2017 starts fresh." (Flaherty Dep. Ex. 13 (ECF No. 25-17), PageID # 240.)

**The January 2017 Reprimand**

After consulting with Human Resources and obtaining a sample reprimand form, Ficker issued Flaherty a written reprimand dated January 4, 2017. (Flaherty Dep. Ex. 12 (ECF No. 25-16), PageID #s 238-29.) This written reprimand specifically quoted Flaherty as having said that the proposed huddle board move was a "ridiculous and insane use of a manager's time" and characterized Flaherty's behavior at the December 15th meeting as "inappropriate" and "unacceptable." (Id. at PageID # 238.) The reprimand also noted a similar issue with respect to Flaherty's behavior at the August 2016 meeting. The reprimand warned Flaherty that she could be subject to termination for "further instances of unacceptable behavior." (Id.) Flaherty acknowledged receipt of the written reprimand with her signature dated January 11, 2017.

On January 9, 2017, Tiffany Higgins replaced Twomey as the Director of Medical Underwriting and became Flaherty's direct supervisor. Higgins was not present at the December 15, 2016 meeting, and Ficker never had any discussions with Higgins about the events of the meeting other than the information contained in the written reprimand. In particular, Ficker did not tell Higgins that the team had been discussing work-at-home expectations during a snowstorm at the time of Flaherty's comments during the December meeting. During her first week as Director, Higgins met individually with each member of the medical underwriting team. On January 12, 2017, she conducted an initial meeting with Flaherty. During this initial meeting, Flaherty asked Higgins if she was aware of the written reprimand. Higgins confirmed that she was aware of the reprimand, although Higgins had no personal knowledge of any of the events

referenced in the reprimand.[6]

Generally, Flaherty made multiple suggestions for process improvements or questioned certain aspects of Lean in 2016 and continuing into 2017. Her managers, Ficker and Higgins, often responded that she had been at the company for a long time and had seen a lot. Flaherty perceived that these comments were not made in a favorable way.[7] Speaking to the group at a department meeting, Ficker once made a general statement to the effect that they had all grown up in an environment with cell phones and technology in the classroom, and Unum's customers had also grown up in that era.[8] Flaherty also recalls that Higgins and Ficker appeared more comfortable engaging with younger employees, although the only such employee she could name turned 50 years old in 2017.[9]

At some point in 2017, Higgins asked Flaherty how much longer she planned on working and whether she had any future career plans besides medical underwriting.[10]

**The February 1, 2017 Meeting**

Flaherty had a meeting to discuss her 2016 performance evaluation with Twomey and Higgins on February 1, 2017. By the time of the meeting, Twomey was no longer Flaherty's manager and was in the midst of her own exit from Unum.

In the evaluation, Flaherty received a rating of "Meets" which Unum defines as "performance is of a good quality that likely satisfies all, and may surpass some, of the

---

[6] The parties dispute to what extent Higgins and Flaherty discussed possible feedback and coaching if Higgins viewed Flaherty as behaving inappropriately. See Higgins Aff., PageID # 396; Flaherty Aff., PageID # 455.

[7] Defendant admits this factual assertion only for the purposes of this Motion. See Def. SMF, PageID #s 347-48.

[8] Defendant admits this factual assertion only for the purposes of this Motion. See Def. SMF, PageID #s 347-48.

[9] Defendant admits this factual assertion only for the purposes of this Motion. See Def. SMF, PageID #s 347-48.

[10] Defendant admits this factual assertion only for the purposes of this Motion. See Def. SMF, PageID #s 347-48.

performance goals." (Flaherty Dep. Ex. 20 (ECF No. 25-24), PageID # 260.). Twomey wrote: "Joanne, 2016 was a year of major changes with leadership changes, organizational changes, and the adoption of the Lean principles. . . . Focus on continuous improvement has always been a focus of the department and you demonstrated this by leading the team through the process of identifying process improvement ideas. You have reviewed these in-depth with the Director of EOI Operations. A number of these ideas have been implemented or are in the process . . . ." (Id. at PageID #s 260-261.) Under the heading of "areas of development focus for the upcoming year," Twomey wrote: "As the new director and service advisor gain experience in their roles, the team will be called on to offer their expertise and provide guidance. I encourage you to remain open to change and exhibit leadership by helping others understand the rationale behind changes. Continue to focus on appropriate behavior and actions through attitude, awareness, and approach." (Id., PageID # 261.)

In the section containing her self-evaluation, Flaherty wrote: "I am committed to the implementation of Lean Management and fully engaged in learning sessions, provided feedback and offered suggestions for change." (Id., PageID # 260.) She further described her work, as follows: "Each day I engage my team; take a proactive approach to serving our customers and play a key role in the success of the department. I have risen to the challenges presented this year, strive to excel at positively representing our department by providing feedback in process improvements, responding to inquiries with a sense of urgency, providing education to partners and following up to inquiries with a sense of urgency, providing education to partners, and following up to ensure customer needs are met on all production lines. I am proud of my accomplishments, the work I do and believe I am a strong contributor to the success of this organization and how business partners view it. My continued commitment is critical to the success of the organization." (Id.)

At the review meeting, Higgins took the opportunity to address Flaherty's comments during the huddle held that morning. Higgins indicated that she felt Flaherty's tone and approach to Angel, a presenter during the meeting, was negative. Flaherty responded that she was unaware of any issue and appreciated the feedback. After the meeting, Flaherty approached Angel directly to discuss and Angel indicated that she had "no issue" with Flaherty and was working to address the issue that Flaherty had raised during the huddle. (Flaherty Dep., PageID # 136.)

**March 15, 2017 Counseling on Written Communications**

On March 15, 2017, Flaherty met with Higgins to discuss three pieces of recent email correspondence. The three email threads reflected a small selection from hundreds of pieces of correspondence which Flaherty would have sent over the course of a week. (Flaherty Aff., PageID # 456.) In one of the email exchanges, Flaherty had sought a more legible copy of a scanned document by asking the individuals involved in accepting it to go back to the submitting party and ask for a more legible copy. (Flaherty Dep. Ex. 14 (ECF No. 25-18), PageID # 243.) She followed up on her request five days later and got an email in response from a manager of the department she had been contacting. The manager indicated that they do not normally handle this type of request. (Id. at PageID # 242.) After exchanging back-and-forth emails with Flaherty, the manager forwarded the entire email exchange to Higgins indicating that the emails documented a "process gap." (Id.) Upon review of the email exchange, Higgins concluded that Flaherty's "tone and content" was "not appropriate." (Higgins Dep. (ECF No. 25-1), PageID # 109.)

Higgins also counseled Flaherty on Flaherty's response to a March 13, 2017 email in which Higgins had instructed her to pass on files to two co-workers. (See Flaherty Dep. Ex. 15 (ECF No. 25-19), PageID # 244.) Flaherty had responded to this request by including the two

co-workers on her email and indicating that she hoped she would not "receive demerits for lack of production in comparison to my peers." (Id.)  In this email and another, Higgins believed Flaherty used a "sarcastic tone" and "had been disrespectful" to Higgins "directly."  (Higgins Aff. (ECF No. 26-7), PageID # 398.)  Higgins specifically cited Flaherty's use of the phrases "surely you can understand" and "please be mindful" in her emails as inappropriate.  (Flaherty Dep. Ex. 14 (ECF No. 25-18), PageID #s 241-43.)

At the end of this meeting, Higgins reminded Flaherty of her earlier reprimand and told Flaherty that she needed to continue to work on her awareness, attitude, and approach in both written and verbal communications.

### March 17, 2017 Meeting

On March 17, 2017 during the morning huddle, Michele Andreasen ("Andreasen") made a quick presentation.  Higgins was not in attendance.  Andreasen had barely started before Underwriter Joe Wallace interrupted her.  (Andreasen Dep., PageID #s 317-318.)  Stewart, another underwriter, then spoke up and tried to respond to Wallace.  At that point, Flaherty asked Stewart to "stop talking." (Flaherty Dep., PageID # 156.)  Stewart replied that Flaherty was acting rudely. After the meeting, both Stewart and Flaherty spoke to Andreasen individually.

Upon her return to the office, Higgins received an email indicating that her team's March 17th huddle had resulted in a "pandemonium."  (Flaherty Dep. Ex. 16 (ECF No. 25-20), PageID # 246.)  As a result, Higgins reached out to the two presenters, Andreasen and Mary Jo Lynch, to seek their input as to what occurred.  On March 23rd, Higgins also spoke to her entire team.  She shared the email she had received and expressed her dissatisfaction with their behavior at the March 17th meeting.  After this meeting, Higgins continued to investigate the March 17th huddle.

She ultimately concluded that Flaherty had behaved inappropriately. Higgins did not discipline any other team member for the "pandemonium" at the March 17th meeting.

**The March 27, 2017 Email**

On March 27, 2017, Higgins sent an email to the underwriting team regarding a new template that she wanted them all to see in preparation for a meeting later in the week. In her email, she indicated that they should focus on three questions on the right of the template and that the other "metrics on there won't make sense yet." (Flaherty Dep. Ex. 17 (ECF No. 25-21), PageID # 247.) Flaherty responded to Higgins's email indicating that it was challenging to focus on the right side because what was listed on the left side of the distributed template was causing "stress levels" to peak for "most if not all" of the team. (Id.) For Higgins, this email was apparently the proverbial straw that broke the camel's back.

Higgins reached out to her assigned Employee Relations Consultant ("ERC") from Unum's human resources department.[11] Pursuant to Unum's progressive discipline policy, Higgins consulted with her ERC prior to terminating Flaherty, but Higgins was not required to obtain approval prior to the termination. On March 28, 2017, Higgins met in person with Flaherty and terminated her employment. Ficker attended the meeting in person, and the ERC attended by telephone, but neither of them spoke much, if at all. The termination letter cited "misconduct" and specifically referenced the January 2017 reprimand by Ficker, the August 2016 meeting, Flaherty's huddle conduct on February 1, 2017 and March 17, 2017, the email counseling Flaherty received

---

[11] At Unum, each manager has an assigned ERC from Unum's human resources department. The manager can consult with the ERC regarding questions or concerns relating to employees under their supervision. Managers at Unum rely on their ERCs in matters of employee discipline and termination. The role of ERCs is not to make or approve decisions regarding discipline, but rather to support managers by providing guidance through the disciplinary process, up to and including termination. To that end, ERCs perform such functions as presenting managers with the range of available options to address a particular employee concern, reviewing existing performance documentation, and providing guidance about next steps, assisting in drafting reprimands and termination letters, and attending termination meetings in a support role.

on March 15, 2017, and her March 27, 2017 email.  (Higgins Aff. Ex. I (ECF No. 26-15), PageID # 415.)

In the year of Ms. Flaherty's termination, she turned 59 years old.  At the time, she was one of nine underwriters employed in her department.  In addition to Flaherty's departure, six other underwriters from this team voluntarily left Unum by the end of 2017; the other departing underwriters ranged in age from 46 to 61 in 2017.

## III.   DISCUSSION

Count I of Plaintiff's Complaint (ECF No. 4-2) claims Plaintiff  was terminated in violation of the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. § 833.  In Count II, Plaintiff asserts that her termination was the result of age discrimination in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*  Defendant has moved for summary judgment as to both claims.

### A.  Count I:  Retaliation under the MWPA

The MWPA provides, "No employer may discharge . . . an employee . . . because . . . [t]he employee, acting in good faith . . . reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." 26 M.R.S.A. § 833(1)(B). The elements of a prima facie MWPA claim are (1) that the employee engaged in protected activity; (2) that the employer imposed adverse employment action against the employee; and (3) that there was a causal connection between the protected activity and the adverse employment action. Cormier v. Genesis Healthcare LLC, 129 A.3d 944, 948 (Me. 2015); see also Theriault v. Genesis Healthcare LLC, No. 2:15-CV-530-GZS, 2017 WL 1403162, at *7 (D. Me. Apr. 19, 2017), aff'd,

890 F.3d 342 (1st Cir. 2018). Under the Law Court's "Maine-specific retaliation paradigm," the Plaintiff must present trialworthy evidence as to each of these three elements to survive summary judgment. Theriault, 890 F.3d at 350-51.

Defendant initially argues that Plaintiff's MWPA claim fails on the first element of her prima facie case in that she did not engage in protected activity. With respect to protected activity, the MWPA is triggered when an employee "has a subjective and objectively reasonable belief that a dangerous condition or practice exists" and makes a "good faith" complaint in an effort "to stop [the] dangerous condition." Cormier, 129 A.3d at 949. In her Complaint, Plaintiff asserted that her complaints on December 15, 2016 qualified as protected activity. (See Compl. ¶ 12-15.) On that day, Flaherty and her colleagues challenged how a team huddle meeting would be conducted if team members were working at home due to inclement weather. Looking at the record of what Flaherty said on December 15, 2016, the Court finds that she has not presented trialworthy evidence of protected activity.

First, even viewing the summary judgment record in the light most favorable to Plaintiff, Flaherty's December 15th complaints were motivated by her subjective concern of "inefficiencies," rather than safety. (Flaherty Dep., PageID # 142.) She clearly indicated that she was hoping to encourage management to think of "easier ways" to hold meetings when members of her team were teleworking. Id., PageID # 141; see also Harrison v. Granite Bay Care, Inc., 811 F.3d 36, 51 (1st Cir. 2016) ("[T]he critical point when analyzing whether a plaintiff has made out the first element of a Whistleblower Act claim—engaging in activity protected by the Act—is an employee's motivation in making a particular report or complaint.") The record, viewed in the light most favorable to Plaintiff, suggests other employees may have complained that the huddle requirements would discourage teleworking during inclement weather. However, Flaherty's

comments and complaints took a different tact by criticizing Twomey's proposed method for conducting the meeting. On the record presented, a factfinder could conclude that Flaherty reasonably believed that her supervisors' huddle plan was ill-advised and a waste of time and resources, but there is no trialworthy evidence that Flaherty actually felt it was unsafe. Rather, the Court concludes that Flaherty has failed to generate trialworthy evidence that she had a subjective or objectively reasonable belief that the proposed meeting process amounted to a dangerous condition.

Second, even assuming that Flaherty's complaints can be construed as including some concern for her manager or co-workers traveling to the office in unsafe driving conditions, Flaherty's statements did not focus on or define this dangerous concern. The Law Court has previously explained that "[v]ague complaints that do not define the dangerous condition therefore may not meet the statute's requirement of a 'report[ ] to the employer.'" Stewart-Dore v. Webber Hosp. Ass'n, 13 A.3d 773, 776 (Me. 2011). Here, the tone and tenor of Flaherty's complaints, which included an "escalated" voice and describing a manager's proposal as "insane," contributed to the vagueness of her complaint.[12] In short, the Court is satisfied that Flaherty's December 15th complaints fall within the "vague" category of complaints that cannot qualify as protected activity under MWPA.

Having concluded that Flaherty did not engage in protected whistleblowing activity, the Court need not reach Defendant's arguments related to the lack of causal connection. Rather, the

---

[12] In its briefing, Defendant argues that Flaherty's manner "went 'too far' to constitute protected activity." (Def. Mot. (ECF No. 30), PageID # 436.) Notably, the Law Court has not had occasion to limit protected activity based on the disruptive manner of a whistleblower's complaint. On the record and briefing presented, the Court declines to predict any such limit. But, the Court recognizes that other federal courts have held "that disruptive or unreasonable protests against discrimination are not protected activity under Title VII and therefore cannot support a retaliation claim." Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) (collecting cases).

Court concludes Defendants are entitled to summary judgment on Count I based on Plaintiff's failure to present trialworthy evidence of protected activity.[13]

## B. Count II: Age Discrimination in Violation of the MHRA

Pursuant to the MHRA, it is unlawful "for any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of . . . age . . . ." 5 M.R.S.A. § 4572(1)(A). Because "Maine courts apply the MHRA in accordance with federal anti-discrimination law," the Court's analysis proceeds under the familiar <u>McDonnell Douglas</u> burden-shifting framework. <u>Forrest v. Brinker Int'l Payroll Co., LP</u>, 511 F.3d 225, 228 n.1 (1st Cir. 2007).

This framework requires that Plaintiff first present a "prima facie case" to support her claim of age discrimination, which requires her to show that "(i) she was at least 40; (ii) her work was sufficient to meet the employer's legitimate expectations; (iii) her employer took adverse action against her; and (iv) either younger persons were retained in the same position upon her termination or the employer did not treat age neutrally in taking the adverse action." <u>Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc.</u>, 804 F.3d 127, 129-30 (1st Cir. 2015) (citing <u>Brennan v. GTE Gov't Sys. Corp.</u>, 150 F.3d 21, 26 (1st Cir. 1998)). Assuming the evidence satisfies these four requirements, the Court then considers whether Defendant has presented evidence of a valid basis for the adverse action. If such evidence is produced, the Court proceeds to the third stage of the <u>McDonnell Douglas</u> framework, in which "the burden reverts to the plaintiff to show that the proffered reason was not the real reason for the adverse employment

---

[13] As noted in Defendant's Reply, Plaintiff's Response (ECF No. 34) offers no substantive rebuttal to the Defendant's arguments in favor of summary judgment on Count I. <u>See</u> Def. Reply (ECF No. 39), PageID # 577 & n.5.) As a result, Plaintiff is deemed to have waived her objection to summary judgment on Count I. <u>See</u> D. Me. L.R. 7(b). Nonetheless, Rule 56 still requires that the Court determine that Defendant is entitled to summary judgment on the record presented and explain its reasons for granting summary judgment. <u>See</u> Fed. R. Civ. P. 56(a); <u>see also</u> <u>Aguiar-Carrasquillo v. Agosto-Alicea</u>, 445 F.3d 19, 25 (1st Cir. 2006) ("It is well-settled that before granting an unopposed summary judgment motion, the court must inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law.") (internal quotations & citations omitted).

action but, rather, was a pretext" for age discrimination.  Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 350 (1st Cir. 2018).  Ultimately, "plaintiffs must 'establish that age was the 'but-for' cause of the employer's adverse action.'"  Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 446 (1st Cir. 2009) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009)).

Initially, Defendant argues that Plaintiff cannot satisfy the second element of the prima facie case in that there is evidence that she received counselling and reprimands regarding her behavior and communications "on at least four occasions between August 2016 and March 2017." (Def. Mot., PageID # 443.)  Plaintiff counters that she can satisfy this second prima facie element given her record of satisfactory employment at Unum, which spanned over thirty years and included multiple promotions.  On this issue, the Court is satisfied that the evidence viewed in the light most favorable to Plaintiff shows that Flaherty's work was sufficient to meet Unum's expectations.[14]  See, e.g., Velez, 585 F.3d at 448 (finding the second element of the prima facie case satisfied by "a twenty-four year period without discipline or indications of deficient performance, and his promotion").

Given the Court's conclusion that Plaintiff has presented a prima facie case and Defendant's clear proffer of a valid basis for its termination decision, the Court must consider whether Plaintiff has trialworthy evidence of pretext.   In this final step, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination.'"  Mesnick v. General

---

[14] To be clear, the Court recognizes Defendant's argument that Flaherty's "behavior and communication style" were "continuously identified as an area of concern in her performance reviews." Def. Reply (ECF No. 39), PageID # 578. However, this argument is premised on viewing the record in the light most favorable to Defendant.  Moreover, this view of the record relies heavily on Unum's selective view of anonymous 360-degree reviews that Flaherty received between 1998 and 2015.  As the Court explained previously, in the context of the pending motion to Court declines to consider these anonymous comments for the truth of the matter asserted.  See supra note 3.

Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990)). The pretext inquiry is "heavily fact-specific," Sabinson v. Trs. of Dartmouth Coll., 542 F.3d 1, 5 (1st Cir. 2008), and, once a court reaches it, that court must be "'particularly cautious' about granting the employer's motion for summary judgment." Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (quoting Stepanischen v. Merchs. Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983)).

In the Court's assessment, the record presents a trialworthy case of age discrimination. Focusing on "the motivations and perceptions" of Higgins and viewing the record in the light most favorable to Flaherty, Higgins, who knew and supervised Flaherty for less than eighty days, made age-disparaging comments during that period, including inquiring how much longer Flaherty planned on working. See Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 16 (1st Cir. 2007) ("When assessing a claim of pretext in an employment discrimination case, a court's focus is necessarily on the motivations and perceptions of the decisionmaker."); Kelley v. Airborne Freight Corp., 140 F.3d 335, 347 (1st Cir. 1998) (explaining that "statements made by decisionmakers can evidence age discrimination").

In addition, Flaherty has put forward evidence that raises weaknesses and impausibilities in the asserted misconduct basis for her termination. See Cookson v. Brewer Sch. Dep't, 974 A.2d 276, 282 (Me. 2009) (explaining that plaintiff may meet her pretext burden by "demonstrat[ing] through affirmative evidence such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and infer that the employer did not act for the asserted non-discriminatory reasons") (internal citations omitted). For example, a factfinder might find weakness in Higgins' reliance on misconduct that she did not actually

witness, including the events underlying the January 2017 reprimand and the March 17, 2017 meeting. A factfinder might also find weakness in Higgins's decision to only discipline Flaherty for the "pandemonium" reported from the March 17th huddle, particularly when the initial eyewitness report suggested a team-wide issue. Further bolstering an implausibility finding would be the "sudden emergence" of Flaherty's misconduct upon the arrival of Ficker and Higgins. See Cyr v. Hannaford Bros. Co. LLC, No. 2:17-CV-00321-GZS, 2019 WL 1140180, at *9 (D. Me. Mar. 12, 2019) (noting that the "sudden emergence of Plaintiff's performance issues" upon the arrival of a new supervisor was part of the "minimally sufficient" circumstantial evidence of pretext) (internal citations omitted). Prior to the arrival of this new management team, the record reflects Unum tolerating and coaching Flaherty on any communication issues, treating any missteps as a performance issue, rather than misconduct. Notably, there is also a factual dispute as to whether the discipline progression for Flaherty followed the letter of Unum's then-existing Discipline Policy. In combination, these facts could lead a jury to disbelieve Unum's stated reason for terminating Flaherty. See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 45 (1st Cir. 2002) (explaining that "disbelief of the reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude that the employer had discriminated").

Conversely, a jury weighing the testimony of Higgins and Unum's other witnesses might conclude that the termination decision was based on the incidents cited in the March 28, 2017 termination letter. However, at this stage, the Court must view the record in the light most favorable to Flaherty. Viewed through this summary judgment lense, there is the potential for finding that Higgins was acting in bad faith and was motivated by Flaherty's age, rather than her underlying misconduct. See Theriault, 890 F.3d at 353 (noting that evidence must "permit the factfinder to conclude that the stated nondiscriminatory justification for the adverse employment

action was either knowingly false or made in bad faith" (quoting <u>Murray v. Kindred Nursing Ctrs. W. LLC</u>, 789 F.3d 20, 27 (1st Cir. 2015)).  Ultimately, on the record presented, the Court concludes Plaintiff has put forward sufficient affirmative evidence that, if credited, would allow a rational factfinder to conclude that Defendant did not terminate her for the asserted misconduct and that her age was the but-for cause of her termination.  Therefore, Defendant is not entitled to summary judgment on Count II.

## IV.    CONCLUSION

For the reasons just stated, the Court hereby GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment (ECF No. 30).  In accordance with this ruling, this case shall be placed on the next available trial list as to Count II only.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 14th day of November, 2019.